**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

DOMINIC JOHNSON, ZION CLARKE,
BERNARD CLAIBORNE, and ALAN HOLMES,

on Behalf of Themselves and a Class of Others Similarly
Situated,                                                                    **25 cv 92**

                                           Plaintiffs,
                                                                                    **CLASS COMPLAINT**

                   -against-

THE CITY OF NEW YORK,
DENNIS MAROLDO, CARY OLIVA,
JOSE TAVAREZ, PABLO TAVERAS,
and "JOHN DOE" 1-50,
in their individual and official capacities,
                                                                                    **JURY TRIAL**
                                                                                    **DEMANDED**
                                           Defendants.

---------------------------------------------------------------x

         Plaintiffs Dominic Johnson, Zion Clarke, Bernard Claiborne, and Alan Holmes

("Plaintiffs"), on behalf of themselves and others similarly situated (collectively, the

"Class"), for their Complaint, allege as follows:

## I.    PRELIMINARY STATEMENT

         1.    This action, brought by four New Yorkers on behalf of a class of similarly

situated people, challenges the New York City Police Department's ("NYPD")

unconstitutional policy and practice of excessively detaining arrestees who are required

to be released from police custody with an Appearance Ticket under New York Criminal

Procedure Law Section 150.20 ("CPL 150.20").

         2.    The NYPD – and more broadly, the City of New York – has violated the

rights of Plaintiffs and the Class by unlawfully ignoring the procedures mandated by CPL

150.20 when issuing appearance tickets (also known as "Desk Appearance Tickets" or "DATs"). In 2020, an amendment to CPL 150.20 replaced the word "may" with "shall." As the Supreme Court of New York has noted, this "indicat[es] that the statute now serves as a mandate that police officers issue an appearance ticket instead of arresting a person who commits a low-level offense as defined in the statute." *Douglas v. City of N.Y.*, 190 N.Y.S.3d 847, 853 (Sup. Ct. 2023).

3.    Rather than following this clear law, the NYPD has unlawfully followed its own nebulous criteria for issuing appearance tickets, routinely denying appearance tickets to individuals clearly entitled to them under the CPL 150.20 criteria.

4.    As a consequence of being subjected to the NYPD's own DAT criteria rather than the criteria laid out in CPL 150.20, thousands of arrested New Yorkers have suffered a significant deprivation of liberty. Rather than go home from police custody shortly after receiving an appearance ticket, these arrestees are transported to Central Booking where they spend an additional *12 to 18 hours* awaiting their criminal court arraignments.

5.    To this day, the NYPD continues to disregard CPL 150.20, thereby depriving certain deserving arrestees of a significant liberty interest. This lawsuit seeks to put an end to this practice.

6.    Plaintiffs, on behalf of a class of similarly situated individuals, seek a declaration that the NYPD's DAT policies and practices are unlawful, damages for the harms they have suffered, and an injunction against those policies and practices moving forward.

## II.    JURISDICTION

7.  This action is brought pursuant to 42 U.S.C. § 1983 ("Section 1983") and 42 U.S.C. § 1988 and the Fourth and Fourteenth Amendments to the United States Constitution.  Jurisdiction is conferred upon this Court by 28 U.S.C. §§ 1331, 1343 (a)(3) and (a)(4), 2201, and 2202, as this action seeks redress for the violation of Plaintiffs' constitutional and civil rights.

### III.    VENUE

8.  Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b) because a substantial part of the acts complained of occurred in this district.

### IV.    JURY DEMAND

9.  Plaintiffs respectfully demand a trial by jury on each and every one of their claims as pled herein, pursuant to Fed. R. Civ. P. 38(b).

### V.    PARTIES

*Plaintiffs*

10. Plaintiff Dominic Johnson is an African-American male who, at all relevant times, was a resident of Manhattan.

11. Plaintiff Zion Clarke is an African-American male who, at all relevant times, was a resident of Manhattan.

12. Plaintiff Bernard Claiborne is an African-American male who, at all relevant times, was a resident of Manhattan.

13. Plaintiff Alan Holmes is an African-American male who, at all relevant times, was a resident of Manhattan.

*Defendants*

14. Defendant City of New York ("Defendant City") is a municipality created, authorized, and existing under the laws of New York State and maintains its principal office in the County of New York.  It authorizes, maintains, directs and supervises the NYPD, which acts as its law enforcement agent and for which it is ultimately responsible.

15.     The individually named defendants – Police Officer Dennis Maroldo, Sergeant Cary Oliva, Police Officer Jose Tavarez, Sergeant Pablo Taveras, and "John Doe" 1-50 ("Defendant Officers") – are and were at all relevant times officers, employees and agents of the NYPD who acted under color of state law and within the scope of their employment.  Each individual defendant is sued in his or her individual and official capacity.

## VI.     NOTICE OF CLAIM

16. Plaintiffs served Notices of Claim on the Comptroller of the City of New York within 90 days of the incidents.  At least 30 days have elapsed since service of the Notices of Claim, and adjustment and payment have been neglected or refused.

## VII.     STATEMENT OF FACTS

### 1.  New York's 2020 Appearance Ticket Rule

17.     On January 1, 2020, under New York's Bail Elimination Act of 2019, sweeping changes to the New York Criminal Procedure Law ("CPL") took effect in order to, among other things, "reduce unnecessary pretrial incarceration."  *See* Bill Number S2101A, available at www.nysenate.gov/legislation/bills/2019/s2101.  These changes to the law took two principal forms.  The first change – widely known as "bail reform" – limited the ability of criminal court judges to set bail on criminal court defendants, particularly defendants charged with misdemeanors.

18.     The second change in the CPL was a new rule – codified in CPL 150.20 – that police officers were *required* to issue "appearance tickets" to people arrested for "violations, infractions, misdemeanors, and certain class E felonies (together, "low-level offenses"), subject to various exceptions (delineated in CPL 150.20(1)(b)((i-xi)), such as the existence of a warrant or the necessity of an order of protection).[1] Prior to the Bail Elimination Act, CPL 150.20 allowed discretion in issuing these tickets, noting officers "may" issue appearance tickets.  But the reformed language of CPL 150.20 specifically replaced the word "may" with the word "shall," creating an explicitly mandatory regime.

19.     These appearance tickets are also known as Desk Appearance Tickets or "DATs".

20.     Practically speaking, this new requirement that the NYPD issue a Desk Appearance Ticket means that the majority of individuals arrested for low-level offenses cannot lawfully be detained to await a criminal court arraignment.  Instead, the individual

----

[1] These exceptions are where the arrestee has "(i) …outstanding local criminal court or superior court warrants"; (ii) failed "to appear in court proceedings in the last two years"; (iii) was "unable or unwilling" to "make their verifiable identity and a method of contact known" after being given "a reasonable opportunity to and has been to do so" (though there "is no requirement that a person present photographic identification in order to be issued an appearance ticket in lieu of arrest where the person's identity is otherwise verifiable");  (iv) been charged with a crime "between members of the same family or household" as defined in CPL 530.11; (v) been "charged with a crime defined in article 130 of the penal law"; (vi) may need to be subject to a protective order; (vii) has been charged with a crime for which "the court may suspend or revoke his or her driver license"; (viii) shown such distress that the arrestee may "face harm without immediate medical or mental health care," such that "bringing the person before the court would be in such person's interest in addressing that need"; (ix) eighteen or more years of age and been charged criminal possession of a weapon on school grounds as defined in section 265.01-a of the penal law; (x) eighteen or more years of age and been charged with a hate crime as defined in section 485.05 of the penal law; or (xi) a qualifying offense pursuant to CPL 510.10(4)(t) or CPL 530.40(4)(t).

may go home from the police precinct with the written appearance ticket, which directs the arrestee to appear in criminal court on a future date.

The alternative to an appearance ticket is that the arrestee must be transported to Central Booking to await his or her criminal court arraignment. Over the course of a 12-to-18-hour detention, the individual must wait at Central Booking to be arraigned in dirty, crowded, and dangerous conditions where they must once again (having already done so at the police precinct) be thoroughly searched, fingerprinted, photographed, and questioned regarding pedigree and health information. There, the arrestee must mix with the general population of other arrestees (including those arrested for violent felonies). Over the course of the detention, the arrestee is detained with others in various holding cells, moving closer to the holding cells directly behind the Criminal Court Arraignment Part.

21. New York's Appearance Ticket rule, as codified in CPL 150.20, was *specifically* designed to spare most low-level arrestees from this prolonged ordeal of Central Booking, by simply scheduling their criminal court arraignment on a future date. *See, e.g.*, N.Y. Crim. Proc. Law § 150.20 (Consol., Lexis Advance through 2024 released Chapters 1-535) (Staff Comm. Notes) ("From the standpoint of the kind of defendant who would unquestionably honor an appearance ticket, use of the ominous, humiliating and frequently expensive arrest procedure for a relatively minor offense seems both unnecessary and unfair. Beyond these considerations, moreover, expanded utility of the appearance ticket would undoubtedly be of substantial assistance in the current attempts to find a way of reducing to a minimum that portion of our jail population consisting of unconvicted persons awaiting trial or other disposition of criminal charges. While the

solution to that problem may lie largely in improved bail procedures, it is manifest that much is to be gained by a system which in many instances would eliminate the necessity of incarceration or bail in the initial stages of a criminal action."); "FY 2020 New York State Executive Budget, Public Protection and General Government Article VII Legislation, Memorandum in Support," at 39 ("This bill would . . . mandate that police issue appearance tickets instead of making custodial arrests in low-level cases . . . . ."); "New York State Senate Democratic Majority, Staff Analysis of the 2019-20 Executive Budget," at 64-65 ("Further, the proposal would require police to issue 64 appearance tickets for all misdemeanors and Class E felonies, with some exceptions – meaning that most of these cases will not result in an automatic arrest."); New York State Assembly Ways and Means Committee, Yellow Book, Review and Analysis of the 2019-20 Executive Budget," at 115 ("The Executive includes language to reform certain pre-trial criminal procedures to require police officers to issue an appearance ticket in lieu of arrest for certain lower level crimes subject to a variety of exclusions . . . . ").

22.     Despite these clear reforms, the NYPD has explicitly violated this rule, unlawfully detaining arrestees for hours on end, whom lawfully ought to have been immediately released.  In doing so, the NYPD and City of New York have exceeded their authority, depriving Plaintiffs and the Class of significant liberty interests.

**2.  The NYPD's Brazen Disregard of CPL 150.20**

23.  NYPD doesn't quietly or secretly ignore CPL 150.20; it does so as a matter of explicit, centrally issued policy.

24.  The NYPD's Desk Appearance Ticket Investigation form (PD 360-091 [Rev. 05-09]) sets forth the NYPD's own criteria for deciding whether to issue a DAT.  These

criteria *have not changed in any way* since CPL 150.20 was enacted five years ago, and retain numerous criteria that unlawfully make issuing an appearance ticket discretionary.

25.  The NYPD has thus continually been in violation of CPL 150.20, and depriving Class Members' liberty interests as a result, since January 1, 2020.

### 3.  The NYPD's DAT Checklist

26.  The NYPD's criteria for denying a desk appearance ticket to individuals arrested for a low-level offense deviates materially from CPL 150.20, as apparent from its own documents and policies.

27.  During arrest processing, NYPD officers routinely (though not always) fill out a Desk Appearance Ticket Investigation form ("DAT form").

28.  The NYPD's DAT form is a two-page document with the arresting officer's identity, the arrestee's background and contact information, the results of a warrant check, DAT serial number and court appearance date (in the event the DAT is issued), and a signature line for the Desk Officer.

29.  The NYPD's DAT form also includes a checklist indicating "Reason DAT Was Denied." Below is a copy of the checklist used for Plaintiff Alan Holmes:

| REASON DAT WAS DENIED | ☐ OTHER: | |
|---|---|---|
| ☐ OUTSTANDING WARRANT | | ☐ DESIGNATED RESIDIVIST PROGRAM (attach copy of FINEST warrant check) |
| ☐ RESIDES OUT OF STATE | | |
| ☐ UNABLE TO VERIFY ADDRESS | | ☐ DESIGNATED OFFENSES AS PER PATROL GUIDE AND INTERIM ORDER |
| ☒ PHOTOGRAPHABLE OFFENSE | | |
| ☐ FAMILY OFFENSE | | ☐ VIOLATION OF ORDER OF PROTECTION OR OR IMMEDIATE NEED TO SECURE ONE |
| ☐ UNABLE TO VERIFY IDENTIFICATION | | |
| ☐ ARREST FOR CRIMINAL SALE OF MARIHUANA 4TH OR 5TH DEGREE | | ☐ HARASSMENT 1ST, OR MENACING 2ND, STALKING OFFENSES |
| ☐ UNDER THE INFLUENCE OF DRUGS/MARIHUANA TO THE DEGREE THAT HE MAY ENDANGER HIMSELF OR OTHERS | | ☐ CHILD ABUSE, NEGLECT, MALTREATMENT |
| | | ☐ GRAFFITI OFFENSES |
| ☐ ASSAULT 3RD, ATTEMPTEDASSAULT 3rd, MENACING, | | ☐ CRIMINAL TRESPASS 3RD (Commercial Presence) |
| ☐ AGGRAVATED HARASSMENT, RECKLESS ENDANGERMENT 2nd DEGREE WHEN COMMITTED AGAINSTACITY/STATE ENFORCEMENT AGENT PERFORMING OFFICIAL DUTY | | ☐ UNLAWFUL EVICTION |
| | | ☐ RESISTING ARREST |
| | | ☐ OBSTRUCTING GOVERNMENTALADMINISTRATION 2ND (Not Uncooperative Action) |
| ☐ ARREST FOR INTOX / IMPAIRED DRIVING--- VTL see 1192 sub 1,2,3,4 | | ☐ INTERFERENCE WITH PROFESSIONAL SPORTING EVENT (A.C. 10-162) |

30.  This checklist contains multiple grounds for denying a Desk Appearance Ticket that are unlawful under CPL 150.20: in other words, these discretionary criteria do not fall under any of the exceptions to CPL 150.20's mandate that the officer "shall" issue the Desk Appearance Ticket.

31.  The NYPD's unlawful discretionary measures for denying a Desk Appearance Ticket include, but are not limited to (1) arrestee resides out of state, (2) photographable offense, (3) arrest for criminal sale of marijuana in the 4th or 5th degree, (4) graffiti offenses, (5) criminal trespass in the 3rd degree, (6) resisting arrest, (7) obstructing governmental administration in the 2nd degree, and (8) interference with professional sporting event (an unclassified misdemeanor under NYC Administrative Code Section 10-162).  Some of these criteria are notably nebulous.  For example, the NYPD maintains no definition for a "photographable offense": indeed, any offense may be deemed to be

"photographable." Upon information and belief, the "photographable offense" reason alone has accounted for thousands of DAT denials.

32. The NYPD has continually used this DAT checklist, or a materially similar checklist, since January 1, 2020.

**4.  The NYPD's DAT Policy and Practice**

33. The NYPD's failure to conform to the lawful CPL 150.20 criteria results in real, significant, widespread deprivations of liberty.

34. The NYPD has utilized, and continues to utilize, the additional factors in its own DAT form checklist (discussed in paragraph 29 above) to deprive thousands of New Yorkers of DATs.

35. NYPD officials possessing authority to establish police procedures regarding the issuance of DATs have instructed line officers to adhere to its DAT form.

36. While the enactment of CPL 150.20 should have alerted the City to the need to conform its DAT issuance practices and procedure to the statutory language, the City has not altered its practices and procedures in any way.

37. The continued use of the NYPD's DAT form is so persistent and widespread that it constitutes a custom that is known to policy-making officials at NYPD.

38.  Beyond the custom of the Department, NYPD officials have failed to properly notify, train, and supervise police officers regarding the issuance of DATs in light of CPL 150.20.

39. Because the decision of whether to issue a DAT exists with virtually every low-level offense arrest, NYPD officials have known to a moral certainty that police officers would confront situations where an arrested individual is entitled to be released under

CPL 150.20, but the arresting officer would use longstanding NYPD criteria (or arbitrary discretion) to deny the arrestee a DAT.

40.  This failure to train and supervise amounts to deliberate indifference to the rights of Plaintiffs and the other members of the Plaintiff classes, who were predictably and unlawfully detained and processed through Central Booking – rather than released with a DAT – after being arrested by NYPD officers.

### 5.  Defendant Officers Violated Plaintiffs' Constitutional Rights by Illegally Transporting them to Central Booking Rather than Releasing Them From the Precinct with DATs

#### a.  *Dominic Johnson and Zion Clarke*

41.    On November 14, 2023, around 9 pm, Zion Clarke was walking on the sidewalk outside 2056 Second Avenue in Manhattan when he was approached by two uniformed NYPD officers – Police Officer Dennis Maroldo ("PO Maroldo") and Sergeant Cary Oliva ("Sgt. Oliva").

42.    PO Maroldo and Sgt. Oliva demanded Mr. Clarke's ID, stating that they had seen him driving with excessively tinted windows.

43.    Mr. Clarke was willing to (and did) identify himself, but stated that he did not have to provide his ID.

44.    Around this time, Dominic Johnson, who was a passenger in Mr. Clarke's car, got out of the car and used his phone to record the disagreement between Mr. Clarke and the officers.

45.    PO Maroldo and Sgt. Oliva activated their body cameras as well.

46.    Upon information and belief, the dashboard camera in the officers' police car was also recording.

47.     As the disagreement continued, the officers arrested Mr. Clarke (Arrest Number M23649080L), handcuffing him behind his back.

48.     Additional officers arrived on the scene.

49.     Soon after arresting Mr. Clarke, PO Maroldo and Sgt. Oliva – assisted by at least one other officer – arrested Mr. Johnson (Arrest Number M23649090H), handcuffing him behind his back.

50.     Mr. Clarke and Mr. Johnson were transported to the NYPD 23rd Precinct, where they were fingerprinted, photographed, and detained in holding cells as their arrest processing took place.

51.     During the course of the arrest processing – which occurred prior to their DAT denial and subsequent detention at Central Booking – Mr. Clarke and Mr. Johnson provided their IDs and information sufficient to be properly identified on their arrest paperwork.

52.     PO Maroldo and Sgt. Oliva completed their arrest paperwork.

53.     Their property, including Mr. Clarke's car and Mr. Johnson's money, was seized and vouchered.

54.     Mr. Johnson's arrest report listed two charges:  Resisting Arrest (New York Penal Law Section ("PL") 205.30), a class A misdemeanor; and disorderly conduct (PL 240.20), a violation.

55.     Mr. Clarke's arrest report listed three charges:  Resisting arrest (PL 205.30); disorderly conduct (PL 240.20); and a tinted windows violation under Vehicle and Traffic Law Section 375 (12-a).

56.     Both Mr. Johnson and Mr. Clarke were entitled to DATs under CPL 150.20 because, among other reasons, neither Mr. Johnson nor Mr. Clarke was arrested for any offense that CPL 150.20 exempted from the DAT requirement; for example, neither man had any active warrants or open cases; neither man was arrested for any felony crimes or any hate crime or any other crime that would result in an order of protection or the suspension of their driving privileges; neither man had failed to appear in court in the last two years; and both men could verify their identity. *See* CPL 150.20(1)(b).

57.     Nevertheless, PO Maroldo and Sgt. Oliva decided *not* to issue Mr. Clarke and Mr. Johnson DATs, which would enable them to be released from the precinct within a few hours.

58.     Instead, using their arbitrary discretion, ignoring CPL 150.20, having no basis except the NYPD's *own* DAT-exemption for resisting arrest (which doesn't exist under CPL 150.20), the defendant officers ensured that Mr. Clarke and Mr. Johnson would be transported to and through Central Booking to await their arraignment.

59.     Mr. Johnson was transported to Central Booking in Lower Manhattan, where he remained detained until his arraignment approximately 24 hours after his arrest.

60.     Because Mr. Clarke was experiencing physical pain from his forceful arrest, he was transported to Metropolitan Hospital for treatment; after being seen and released from Metropolitan Hospital, Mr. Clarke was transported to Central Booking in Lower Manhattan to await his arraignment.

61.     In the evening of November 15, 2023, Mr. Clarke and Mr. Johnson were arraigned in New York County Criminal Court.

62.     Mr. Clarke was prosecuted under Docket No. CR-033067-23NY, while Mr. Johnson was prosecuted under Docket No. CR-033068-23NY.

63.     Mr. Clarke and Mr. Johnson were charged as co-defendants under the same criminal court complaint; they were charged with one count of Resisting Arrest pursuant to PL 205.30.

64.     The presiding criminal court judge, who had no ability under the Bail Reform law to set bail, released Mr. Clarke and Mr. Johnson but ordered them to return to court for a future appearance.

65.     On February 16, 2024, Mr. Johnson's prosecution was dismissed pursuant to speedy trial provisions under CPL 30.30; around the same time, and for the same reason, Mr. Clarke's prosecution was also dismissed.

   b.  *Alan Holmes and Bernard Claiborne*

66.     On June 3, 2023, around 11:30 pm, Bernard Claiborne and Alan Holmes were gathered with friends, family, and community members to attend a candlelight vigil in memory of their recently deceased cousin.

67.     The candlelight vigil was being held outside 2215 7th Avenue in Manhattan.

68.     During the vigil, NYPD officers – including Police Officer Jose Tavarez ("PO Tavarez") – began interacting and arguing with some of the vigil attendees, precipitating a shoving match between officers and several attendees.

69.     Mr. Holmes and Mr. Claiborne became embroiled in that shoving match.

70.     Mr. Holmes and Mr. Claiborne were forcefully arrested (Arrest Number M23623108-Y for Holmes; M23623110 for Claiborne).

71.     Mr. Holmes and Mr. Claiborne were transported to the 32nd Precinct in Manhattan by PO Tavarez and other officers.

72.     Mr. Holmes' and Mr. Claiborne's arrest charges consisted of various low level offenses and violations:  Resisting Arrest (PL 205.30), a class A misdemeanor; Obstructing Governmental Administration (PL 195.04), a class A misdemeanor; Unlawful Assembly (PL 240.10), a class B misdemeanor; Consumption of Alcohol in Public (a violation under the NYC Administrative Code); Disorderly Conduct (PL 240.20), a violation; Loitering in a Public Place for Purposes of Gambling (PL 240.35), a violation; and Harassment in the second degree (PL 240.26), a violation.

73.     Mr. Holmes and Mr. Claiborne spent about twenty hours detained in the 32nd Precinct before being transported to Central Booking in lower Manhattan.

74.     They spent another twelve to eighteen hours in Central Booking before being arraigned.

75.     Mr. Holmes and Mr. Claiborne were entitled to DATs, but the supervising officers at the 32nd Precinct, along with their arresting officer PO Tavarez, ensured that they were denied DATs and transported to Central Booking.

76.     Both Mr. Holmes and Mr. Claiborne were entitled to DATs under CPL 150.20 because, among other reasons, neither Holmes nor Claiborne was arrested for any offense that CPL 150.20 exempted from the DAT requirement; for example, neither man had any active warrants or open cases; neither man was arrested for any felony crimes or any hate crime or any other crime that would result in an order of protection or the suspension of their driving privileges; neither man had failed to appear in court in the last two years; and both men could verify their identity.  *See* CPL 150.20(1)(b).

77.    Sgt. Pablo Taveras signed off on the Desk Appearance Ticket Investigation form that stated the reason (the box was checked off) for denying Holmes and Claiborne a DAT was: "Photographable offense."

78.    Mr. Claiborne was arraigned in New York County Criminal Court on the morning of June 5, 2023 on Docket No CR-015594-23; he was released on his own recognizance approximately thirty-six hours after his arrest.

79.    Mr. Holmes was also arraigned in New York County Criminal Court on the morning of June 5, 2023 on Docket No. CR-015591-23NY; he was released on his own recognizance approximately thirty-six hours after his arrest.

80.    On July 24, 2023, Claiborne resolved his criminal court case by accepting an Adjournment in Contemplation of Dismissal ("ACD"); around the same, Mr. Holmes resolved his criminal court case by accepting an ACD.  Both of their cases were ultimately dismissed.

**6. Plaintiffs Suffered a Deprivation of Rights, Loss of Liberty, and Emotional Damages, Continue to Suffer, and Reasonably Fear Future Illegal Seizures by NYPD Officers.**

81.    As a direct and proximate cause of the acts of the Defendants, the injuries and damages sustained by the named Plaintiffs and other members of the class from the deprivation of civil rights include: violation of their clearly established rights under the Fourth and Fourteenth Amendments to the United States Constitution; personal injuries; pain and suffering; emotional distress; extreme fear; humiliation, indignities, and embarrassment; degradation; injury to reputation; and loss of liberty.

82.    Since their illegal, excessive detentions, Plaintiffs fear that future encounters with NYPD officers will result in additional illegal seizures.  Plaintiffs are

apprehensive when encountering NYPD officers, and they are hesitant to reach out to NYPD officers should they need the assistance of law enforcement.

83.    Plaintiffs' fear is particularly well-founded because police officers who make arrests may be financially incentivized to prolong detentions. Prolonged detentions increase the likelihood of getting paid overtime. Whereas a DAT takes a couple of hours to issue, the act of transporting an arrestee to Central Booking can extend an officer's responsibilities with respect to an arrestee by many hours. Not only does the officer need to arrange transportation to Central Booking and ensure the orderly delivery of an arrestee into the custody of the NYC Department of Correction, but the NYPD officer must also make him- or herself available to speak with prosecutors in the Early Case Assessment Bureau who review criminal allegations, speak with witnesses, and draft accusatory instruments prior to the arraignments of criminal court defendants.

84. Plaintiffs' fears of future illegal detention are reasonable and credible, especially because Plaintiffs were clearly entitled to, but did not receive, mandatory DATs during their above-described 2023 arrests. Plaintiffs understand that if they are ever detained again by the NYPD, the NYPD may arbitrarily and illegally extend their detentions and cause them to endure Central Booking.

## VIII.   CLASS ACTION ALLEGATIONS

85.   Plaintiffs bring this action as a class action under Fed. R. Civ. P. 23(b)(2) for violations of their constitutional rights.

86.   The Rule (b)(2) class is comprised of all persons eligible to receive a DAT under CPL 150.20 between January 1, 2020 and the present who were denied a DAT ("Rule (b)(2) Class"). The Rule (b)(2) Class is comprised of all persons whose loss of liberty

following an arrest was unjustifiably prolonged and exacerbated by being transported to Central Booking (to await their arraignment) rather than being issued a DAT, during the fullest period permitted by the applicable statute of limitations.

87. Defendants have acted, or failed to act, on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

88. Upon information and belief, the Rule (b)(2) Class includes thousands of individuals and is so numerous that joinder of all Rule (b)(2) Class members is impracticable.

89. Plaintiffs also bring this action as a class action under Fed. R. Civ. P. 23(b)(3) for violations of their constitutional rights.

90. The Rule (b)(3) Class is comprised of all persons eligible to receive a DAT under CPL 150.20 between January 1, 2020 and the present who were denied a DAT ("Rule (b)(3) Class").   The class is comprised of all persons excessively detained pursuant to the NYPD's policy and practice of denying deserving arrestees of DATs, during the fullest period permitted by the applicable statute of limitations.

91. All members of the Rule (b)(3) Class were injured as a result of Defendants' misconduct.

92. Upon information and belief, the Rule (b)(3) Class includes thousands of individuals and is so numerous that joinder of all Rule (b)(3) Class members is impracticable.

93. The questions of law and fact presented by Plaintiffs are common to members of the Rule (b)(2) Class and the Rule (b)(3) Class (collectively "the Classes").

94. Common issues of law and fact predominate over any individual issues.

95. This unconstitutional policy, pattern and practice has resulted in the wrongful detention, deprivation of liberty, psychological injury, and emotional injury of individuals who were arrested for low-level crimes and deserved to be released from police custody within a few hours with DATs. The claims and practices alleged in this complaint are common to all members of the Classes.

96. The violations suffered by Plaintiffs are typical of those suffered by the Classes. The members of the Classes will benefit from the remedial and monetary relief sought.

97. Plaintiffs have no known conflict of interest with any members of the Classes and will fairly and adequately protect the interests of the Classes. Counsel that is competent and experienced in federal class action and federal civil right litigation has been retained to represent the Classes.

98. This action is superior to any other method for the fair and efficient adjudication of this legal dispute, as joinder of all members of the Classes is not only impracticable, but impossible given the volume and continuing nature of the violations as well as the transient nature of the members of the Classes. The damages suffered by members of the Classes, although substantial, are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for members of the Classes to attempt redress for damages incurred due to their wrongful detention.

99. There will be no extraordinary difficulty in the management of the class action.

## CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
**42 U.S.C. § 1983 – False Imprisonment in Violation of the Fourth Amendment**

100.      Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein, and further alleges as follows:

101.      By the actions described, the Defendants deliberately deprived Plaintiffs and the other members of the Class of their Fourth Amendment right to be free of unreasonable or unwarranted restraints on personal liberty, specifically their right to be free from false imprisonment.

102.      The Defendant Officers intentionally caused the extended confinement of Plaintiffs and other Class members after they should have been released from police custody with DATs; Defendants had no warrant, consent, or privilege to do so.

103.      Said confinement was not privileged because CPL 150.20 mandated release with a DAT.

104.      As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs and the other members of the Class sustained the damages and injuries herein alleged.

<u>**SECOND CAUSE OF ACTION**</u>
**42 U.S.C. § 1983 – Violation of Procedural Due Process**

105.      Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein, and further allege as follows:

106.      By the actions described, Defendants deprived Plaintiffs of their Fourteenth Amendment right to due process of law.

107.      Rather than release Plaintiffs with DATs – as required by CPL 150.20 – the individual defendants, exercising arbitrary discretion, prolonged Plaintiffs' detention by transporting them to Central Booking to await arraignment.

108.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiffs sustained the damages and injuries hereinbefore alleged.

### THIRD CAUSE OF ACTION

**MUNICIPAL LIABILITY UNDER 42 U.S.C. §1983 – *MONELL* CLAIM**
**Unconstitutional Custom or Policy and Failure to Supervise and Train**

109.    Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein, and further allege as follows:

110.    The City of New York, by and through its final policymakers, had actual or constructive knowledge that during the relevant time period and for years before, the NYPD had in force and effect a policy, practice or custom of unlawfully detaining individuals rather than releasing them with DATs, thus depriving Plaintiffs and the other members of the Class of their clearly established constitutional rights to be free of unreasonable seizures and deprivations of liberty without due process of law under the Fourth and Fourteenth Amendments to the United States Constitution.

111.    The City, by and through its final policymakers, knew or should have known that, as a consequence of its policy, practice and custom of ignoring CPL 150.20 criteria while following its own DAT-issuance criteria, these constitutional violations would result, and its failure to correct it amounted to deliberate indifference to the constitutional rights of the City's residents, including the named Plaintiffs, and was the moving force behind the illegal seizures and due process violations, as well as the other injuries and damages set forth above.

### FOURTH CAUSE OF ACTION
**FALSE IMPRISONMENT UNDER NEW YORK LAW**

112.    Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein, and further allege as follows:

113.    Defendants intentionally caused the confinement of Plaintiffs and all other members of the Class for an unreasonable amount of time after each of them was supposed to be released from police custody with a DAT.

114.    Plaintiffs were conscious of such confinement and did not consent to such confinement.

115.    Said confinement was not privileged because any justification for confinement disappeared at the time the Plaintiffs-arrestees were supposed to be released from police custody with DATs.

116.    As a direct and proximate result of the misconduct and abuse of authority detailed above, Plaintiffs sustained the damages and injuries hereinbefore alleged.

### FIFTH CAUSE OF ACTION
### Violation of Due Process under N.Y. State Constitution

117.    Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein, and further alleges as follows:

118.    By the actions described, Defendants deprived Plaintiffs of their rights to due process of law under the New York State Constitution.

119.    Rather than release Plaintiffs with DATs, the individual defendants, exercising arbitrary discretion, prolonged Plaintiffs' detention by failing to issue them DATs and transporting them to Central Booking to await arraignment.

120.    As a direct and proximate result of the aforementioned conduct of the individual defendants, Plaintiffs sustained the damages and injuries hereinbefore alleged.

### SIXTH CAUSE OF ACTION

**Right of Security Against Unreasonable Search and Seizure and Excessive Force Under New York City Administrative Code**

121.    Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein.

122.    As detailed above, Defendants intentionally violated Plaintiffs' right to be secure against unreasonable searches and seizures, and against excessive force, in violation of New York City Administrative Code Title 8, Chapter 8:  The Right of Security Against Unreasonable Search and Seizure and Against Excessive Force Regardless of Whether Such Force Is Used In Connection with a Search or Seizure.  § 8-803 Civil action for deprivation of rights.

123.    As a direct and proximate result, Plaintiffs sustained the damages and injuries hereinbefore alleged.

## SEVENTH CAUSE OF ACTION

### *Respondeat Superior* Under N.Y. State Law

124.    Plaintiffs reallege and reiterate all allegations set forth in the preceding paragraphs as if stated fully herein.

125.    Defendant City is the employer of the individual defendants.

126.    Under the doctrine of *respondeat superior*, Defendant City is responsible for the wrongdoing of its employees acting within the scope of their employment.

127.    As a direct and proximate result of the acts of the individual defendants detailed above, Plaintiffs sustained the damages and injuries hereinbefore alleged.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand the following relief jointly and severally against the Defendants:

a.    An order determining that this action may be maintained as a class action under Fed. R. Civ. P. 23(a), (b)(2) and (b)(3), and directing that notice of this action be given to members of the Classes;

b.    A judgment declaring that Defendants have committed the violations of the law alleged in this action;

c.    An order preliminarily and permanently enjoining and directing Defendants to faithfully apply CPL 150.20 to its DAT-issuance decisions;

d.    An order directing immediate remedial training on the legal grounds for issuing or denying DATs to arrestees;

e.    An order directing Defendants to implement a system for monitoring their DAT decisions;

f.    An order awarding compensatory damages for Plaintiffs and the other members of the Classes in an amount to be determined at trial;

g.    An order awarding punitive damages in an amount to be determined at trial;

h.    An order, pursuant to 42 U.S.C. § 1988, that Plaintiffs and the other members of the Classes are entitled to reasonable attorneys' fees, costs and disbursements; and

i.    Such other and further relief as this Court may deem appropriate.


DATED:    January 3, 2025                  __/s/_Cyrus Joubin_____
          New York, New York              CYRUS JOUBIN, ESQ.
                                          43 West 43rd Street, Suite 119
                                          New York, NY 10036
                                          (703) 851-2467
                                          joubinlaw@gmail.com

_____/s/ Matthew Handley_____
HANDLEY FARAH & ANDERSON PLLC
MATTHEW HANDLEY
1201 Connecticut Avenue, NW
Suite 200K
Washington, DC 20036
202-559-2411
mhandley@hfajustice.com

_____ /s/ George Farah_____
HANDLEY FARAH & ANDERSON PLLC
GEORGE FARAH
REBECCA P. CHANG
SAMANTHA BRAVER
33 Irving Place
New York, NY 10003
212-477-8090
gfarah@hfajustice.com
rchang@hfajustice.com
sbraver@hfajustice.com

*Attorneys for Plaintiffs and the Putative Classes*