UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------x
DOMINIC JOHNSON, ZION CLARKE,
BERNARD CLAIBORNE and ALAN HOLMES,

                   Plaintiffs,                              25-cv-92 (PKC)

        -against-                          OPINION AND ORDER

THE CITY OF NEW YORK, DENNIS
MAROLDO, CARY OLIVA, JOSE TAVAREZ,
PABLO TAVERAS and "JOHN DOE" 1-50, in
their individual and official capacities,

                   Defendants.
-------------------------------------------------------------x

CASTEL, U.S.D.J.

        New York's Bail Elimination Act of 2019, N.Y. Crim. Pro. § 150.20, requires that law-enforcement officers "shall" issue Desk Appearance Tickets ("DATs") to arrestees for all offenses other than those expressly listed in the statute unless falling within an exception.  The prior version of the statute granted officers the discretion to choose between issuing a DAT or holding the arrestee in custody pending arraignment.  The four plaintiffs assert that after they were arrested by officers of the New York City Police Department (the "NYPD") under circumstances and for offenses not excluded by the DAT requirement of section 150.20, and that they were unlawfully detained for periods of twenty-four to thirty-six hours before they were arraigned and released.  Plaintiffs assert that section 150.20 required their immediate release by the officers upon issuance of a DAT.

        Premised upon their claim of wrongful detention under section 150.20 of New York's Criminal Procedure Law, plaintiffs bring federal section 1983 claims against the individual NYPD officers, alleging that the state law violation deprived them of the right of due

process protected by the Fourteenth Amendment and deprived them of liberty under the Fourth Amendment. 42 U.S.C. § 1983. They also assert a federal Monell municipal liability claim against the City premised upon their detention. Defendants City and four members of the NYPD move to dismiss the federal claims for failure to state a claim for relief. Rule 12(b)(6), Fed. R. Civ. P.

For the purposes of this motion, the Court assumes that section 150.20 required the defendant officers to issue DATs to plaintiffs and that they were wrongfully detained pending arraignment. But accepting the truth of plaintiffs' non-conclusory factual allegations, they do not plausibly allege that section 150.20 creates a protectible interest in obtaining a DAT under the Fourth or Fourteenth Amendments. The Second Circuit has held that the Fourth and Fourteenth Amendments are not implicated by an arrestee's failure to receive a DAT, and the Supreme Court has held that the Fourth Amendment's protections are not affected when a state adopts arrest policies that go beyond what is required by the United States Constitution. See Bryant v. City of New York, 404 F.3d 128 (2d Cir. 2005); Virginia v. Moore, 553 U.S. 164 (2008).

Plaintiffs' federal claims will therefore be dismissed. Plaintiffs also bring New York state law claims against all defendants, and with the federal claims dismissed, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.

BACKGROUND.

I.      Overview of Section 150.20.

The Bail Elimination Act of 2019, N.Y. Crim. Pro. § 150.20, went into effect on January 1, 2020, and amended the statute governing a police officer's use of a DAT. (Compl't ¶ 17.) For defined categories of offenses, section 150.20 provides that "[w]henever a police

officer is authorized . . . to arrest a person without a warrant for an offense . . . he shall . . . instead issue and serve upon such person an appearance ticket." N.Y. Crim. Pro. L. § 150.20(1)(a). The revised statute made the issuance of DATs mandatory by substituting the word "may" with "shall," whereas its predecessor gave officers discretionary authority to issue DATs. (Compl't ¶ 18.) As phrased by plaintiffs, section 150.20 now provides "an explicitly mandatory regime." (Compl't ¶ 18.)

Plaintiffs assert that the new law has the practical effect of requiring most individuals charged with low-level offenses to be released from police custody with a DAT that includes an appearance for a future court date, rather than holding them in detention until a criminal arraignment takes place. (Compl't ¶ 20.) According to plaintiffs, a person detained prior to arraignment typically waits twelve to eighteen hours in a holding cell in Central Booking, where the arrestee is placed in a general population that includes people arrested for violent felonies. (Compl't ¶ 20.) Plaintiffs assert that section 150.20 is intended to create a less burdensome, streamlined process for low-level arrestees. (Compl't ¶ 21.)

The statute contains eleven categories of exemptions from the DAT mandate. N.Y. Crim. Pro. L. § 150.20(1)(b). For the purposes of this motion, defendants do not dispute that plaintiffs were entitled to receive a DAT under section 150.20.

II.    The Arrest, Detention and Release of Plaintiffs Clark and Johnson.

On November 14, 2023, plaintiff Zion Clarke was approached on the sidewalk of Second Avenue in Manhattan by defendants Dennis Maroldo and Cary Oliva, who are both NYPD officers. (Compl't ¶ 41.) They demanded Clarke's ID, stating that they observed him driving with excessively tinted windows. (Compl't ¶ 42.) Clarke identified himself but declined to provide ID. (Compl't ¶ 43.)

Plaintiff Dominic Johnson was a passenger in Clarke's vehicle, which he exited in order to record the exchange between Clarke and the two officers. (Compl't ¶ 44.) Maroldo and Oliva activated their body cameras. (Compl't ¶ 45.) The disagreement continued, Maroldo and Oliva handcuffed Clarke, and more officers arrived on the scene. (Compl't ¶¶ 47-48.) Officers arrested plaintiffs Clarke and Johnson, who were transported to the NYPD's 23rd Precinct for processing. (Compl't ¶¶ 49-50.) Clarke and Johnson provided their IDs, and defendants Maroldo and Oliva completed the arrest paperwork. (Compl't ¶¶ 51-52.)

Johnson's arrest report listed two charges: resisting arrest, a misdemeanor, and disorderly conduct, a violation. (Compl't ¶ 54.) Clarke's arrest report listed three charges: resisting arrest, disorderly conduct, and a tinted-windows violation. (Compl't ¶ 55.) Johnson and Clarke assert that they were entitled to DATs under section 150.20 because none of the offenses fell within categories exempted from the DAT requirement. (Compl't ¶ 56.) But instead of receiving DATs, Johnson and Clarke were transported to Central Booking for further processing and arraignment in criminal court. (Compl't ¶¶ 57-60.) They were arraigned on the evening of November 15, 2023, approximately twenty-four hours after their arrests. (Compl't ¶ 61.) Each was charged with one count of resisting arrest. (Compl't ¶ 63.) They were released on bail, and on February 16, 2024, the charges against them were dismissed pursuant to speedy-trial provisions. (Compl't ¶¶ 64-65.)

III.     The Arrest, Detention and Release of Plaintiffs Claiborne and Holmes.

On June 3, 2023 at around 11:30 p.m., plaintiffs Bernard Claiborne and Alan Holmes were at a candlelight vigil taking place on Seventh Avenue in Manhattan. (Compl't ¶¶ 66-67.) Defendant Jose Tavarez, an NYPD officer, engaged in what the Complaint calls a "shoving match" with vigil attendees, which eventually "embroiled" Claiborne and Holmes.

(Compl't ¶¶ 68-69.)  Claiborne and Holmes were arrested and transported to the 32nd Precinct in Manhattan.  (Compl't ¶¶ 70-71.)

Their arrest charges included three misdemeanor charges: resisting arrest, obstructing governmental administration and unlawful assembly, as well as consumption of alcohol in public, a violation of the New York City Administrative Code; disorderly conduct, a violation; loitering in a public place for purposes of gambling, a violation; and harassment in the second degree, a violation.  (Compl't ¶ 72.)  Holmes and Claiborne were detained at the 32nd Precinct for approximately twenty hours before being transported to Central Booking, where they were held for another twelve to eighteen hours before being arraigned.  (Compl't ¶¶ 73-74.)

Holmes and Claiborne assert that they were entitled to DATs under section 150.20 because they were not charged with offenses that fall within categories exempted from the DAT requirement.  (Compl't ¶ 76.)  Notwithstanding the language of section 150.20, defendant Pablo Taveras, an NYPD officer, checked a box on a Desk Appearance Ticket Investigation form stating that DATs were denied due to a "Photographable offense."  (Compl't ¶ 77.)  The Complaint asserts that this checklist is outdated and lists discretionary criteria that is incompatible with the now-operative language of section 150.20.  (Compl't ¶¶ 29-32.)  On the morning of June 5, 2023, both Holmes and Claiborne were released on bail, approximately 36 hours after their arrests.  (Compl't ¶¶ 78-79.)  The charges against them were ultimately dismissed.  (Compl't ¶ 80.)

RULE 12(b)(6) STANDARD.

To survive a motion to dismiss under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly,

550 U.S. 544, 570 (2007)).  A court assessing the sufficiency of a complaint must disregard legal labels or conclusions, which are not entitled to the presumption of the truth.  Iqbal, 556 U.S. at 678.  Instead, the court must examine only the well-pleaded factual allegations, if any, "and then determine whether they plausibly give rise to an entitlement to relief."  Id. at 679.  "Dismissal under Rule 12(b)(6) is therefore appropriate only if 'it is clear from the face of the complaint, and matters of which the court may take judicial notice, that the plaintiff's claims are barred as a matter of law.'"  Michael Grecco Productions, Inc. v. RADesign, Inc., 112 F.4th 144, 150 (2d Cir. 2024) (quoting Sewell v. Bernardin, 795 F.3d 337, 339 (2d Cir. 2015)).  In reviewing a Rule 12(b)(6) motion, the Court assumes all factual allegations in the complaint to be true and draws all reasonable inferences in favor of the non-moving party.  Peretti v. Authentic Brands Group LLC, 33 F.4th 131, 137 (2d Cir. 2022).

DISCUSSION.

I.    Plaintiffs Do Not Plausibly Allege a Due Process Claim.

Plaintiffs assert that they were denied procedural due process when defendants transported them to Central Booking to await arraignment, rather than release them with DATs, as required by section 150.20.  (Compl't ¶¶ 105-08.)  They assert that defendants' arbitrary acts of discretion prolonged their detention.  (Compl't ¶¶ 106-07.)

"A procedural due process claim is composed of two elements: (1) the existence of a property or liberty interest that was deprived and (2) deprivation of that interest without due process."  Radwan v. Manuel, 55 F.4th 101, 123 (2d Cir. 2022) (quotation marks omitted).

A violation of state law typically does not give rise to a claim under the United States constitution.  See, e.g., Pollnow v. Glennon, 757 F.2d 496, 501 (2d Cir. 1985); Mitchell v. New York City Dep't of Educ., 2025 WL 978366, at *4 (2d Cir. Mar. 31, 2025) (summary

order).  But in limited circumstances, a state law may create a liberty interest that affords a procedural due process right.  See Sealed v. Sealed, 332 F.3d 51, 55 (2d Cir. 2003) ("Although some due process protections stem independently from the Fourteenth Amendment, state law may also create liberty or property interests entitled to due process protection.").

Plaintiffs rely principally on Sandin v. Conner, 515 U.S. 472 (1995), which arose in the context of an inmate's disciplinary segregation in a state prison's special housing unit. The inmate asserted that the prison's administrative committee assigned him to special housing without making the factual findings required by institutional regulation.  Id. at 474-76.  Asserting that prison regulations created a liberty interest in remaining free from disciplinary segregation, plaintiff brought a claim under section 1983.  Id. at 476-77.

Sandin revisited the large body of Supreme Court authority governing the liberty interests that may arise from prison rules and regulations.  Id. at 477-85.  Under the then-governing line of authority, where a law or regulation gave prison officials discretionary decision-making power, a liberty interest could not attach, but when the exercise of official power was phrased in a way that made official action mandatory, such as requiring a sentence reduction for good behavior, a liberty interest attached.  See id.  Sandin characterized this as a "somewhat mechanical dichotomy" that "led to the involvement of federal courts in the day-to-day management of prisons" and disincentivized states from codifying prison-management procedures.  See id. at 479, 482.

Rather than base the liberty-interest analysis on the difference between discretionary versus mandatory powers,[1] Sandin "recognize[d] that States may under certain

---

[1] The discretionary-versus-mandatory distinction is still employed in this Circuit in deciding whether a law creates a property interest subject to due process protections, as opposed to a liberty interest.  See Handberry v. Thompson, 446 F.3d 335, 353 n.6 (2d Cir. 2006).

circumstances create liberty interests which are protected by the Due Process Clause," "[b]ut these interests will generally be limited to freedom from restraint which . . . imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." Id. at 484. It concluded that plaintiff's disciplinary confinement in a special housing unit "did not present the type of atypical, significant deprivation in which a State might conceivably create a liberty interest." Id. at 486; see also id. at 485 (though punitive, plaintiff's assignment to special housing "does not present a dramatic departure from the basic conditions of [his] indeterminate sentence.").

Thus, to succeed on a Fourteenth Amendment due process claim, a plaintiff "must establish both that the confinement or restraint creates an 'atypical and significant hardship' under Sandin, and that the state has granted its inmates, by regulation or by statute, a protected liberty interest in remaining free from that confinement or restraint." Frazier v. Coughlin, 81 F.3d 313, 317 (2d Cir. 1996); accord Baltas v. Chapdelaine, 153 F.4th 328, 337 (2d Cir. 2025). "[T]he ultimate issue of atypicality is one of law . . . ." Sealey v. Giltner, 197 F.3d 578, 585 (2d Cir. 1999). "In determining whether disciplinary confinement is sufficiently onerous to impact a protected liberty interest, this Court focuses on two factors: the duration of the confinement and the conditions under which it occurs." Vidal v. Venettozzi, 171 F.4th 611, 617 (2d Cir. 2026). "To assess whether confinement is atypical and significant, we compare the challenged confinement to periods of comparable deprivation typically endured by other prisoners in the ordinary course of prison administration." Id. "[E]specially harsh conditions endured for a brief interval and somewhat harsh conditions endured for a prolonged interval might both be atypical." Sealey, 197 F.3d at 586.

Courts undertake a context-specific analysis to determine whether a plaintiff has identified an atypical and significant hardship.  Vidal surveyed Second Circuit authorities that closely examined the duration of inmates' confinement in special-housing units, the distinctions between administrative and disciplinary confinement, and inmates' precise disciplinary conditions such as access to exercise, showers, hygiene products and books.  171 F.4th at 616-19; see also Ruggiero v. Fischer, 807 Fed. App'x 70, 73 (2d Cir. 2020) (use of mechanical restraints for a one-hour period was not atypical hardship in facility that consisted entirely of special housing units) (summary order); Lee v. Governor of State of N.Y., 87 F.3d 55, 58 (2d Cir. 1996) (plaintiffs did not identify atypical hardship based on ineligibility for a temporary-release program that they never participated in).

Courts have uniformly rejected the assertion that section 150.20 creates a liberty interest in the issuance of a DAT.  See Johnson v. City of New York, 2022 WL 4133284, at *4 (S.D.N.Y. Sept. 12, 2022) ("The Court is . . . unaware of any cases, either within the Second Circuit or within the New York state courts, that have held that section 150.20 created a protected liberty interest.").  Before enactment of the Bail Elimination Act of 2019, the Second Circuit considered a substantive due process challenge to the discretionary denial of a DAT, and held that "the issuance of a DAT for the release of an arrestee immediately upon completion of the postarrest administrative procedures is not constitutionally required.  . . .  What is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours." Bryant, 404 F.3d at 138.  More recently, Judge Cogan dismissed Fourth Amendment and Fourteenth Amendment claims premised on plaintiffs' claim that section 150.20 mandated that they receive a DAT instead of being detained pending arraignment.  McQueen v. City of New York, 2023 WL 1995017, at *3

(E.D.N.Y. Feb. 14, 2023).  Stating that "plaintiffs' attempt to base federal constitutional requirements on state statutory law is misplaced," Judge Cogan concluded that Bryant's "holding as to '[w]hat is constitutionally required' remains applicable even if the officers violated state law in failing to issue a DAT."  Id. at *3, *3 n. 6.

This Court adheres to the reasoning of Bryant, as recently applied by Judge Cogan in McQueen.  Plaintiffs rely on Sandin, and authorities applying Sandin, to argue that "the issuance of a DAT, in lieu of twelve to eighteen hours of further detention in Central Booking," implicates a "freedom from bodily restraint" that is "the most basic form of human liberty . . . ." (Opp. Mem. at 7.)  But the Complaint does not describe either a duration of detention or conditions of detention that can be plausibly described as an atypical or significant hardship.  See Sandin, 515 U.S. at 486; Vidal, 171 F.4th at 616-19.  Johnson and Clarke were detained for approximately twenty-four hours.  (Compl't ¶¶ 59-61.)  Holmes and Claiborne were detained for somewhere between thirty-two and thirty-eight hours.  (Compl't ¶¶ 73-75.)  The Complaint does not plausibly allege that these were prolonged periods of detention, and they were shorter in duration than the forty-eight hour period cited by Bryant, 404 F.3d at 138.

The Complaint also does not describe atypical conditions that imposed a unique hardship for any plaintiff.  It alleges that Central Booking has "dirty, crowded, and dangerous conditions" where plaintiffs were "thoroughly searched, fingerprinted, photographed, and questioned regarding pedigree and health information."  (Compl't ¶ 20.)  It asserts that arrestees "must mix with the general population of other arrestees (including those arrested for violent felonies)."  (Compl't ¶ 20.)  But these broad descriptions of Central Booking describe neither "especially harsh conditions endured for a brief interval" nor "somewhat harsh conditions endured for a prolonged interval . . . ."  Sealey, 197 F.3d at 586.  They do not identify danger or

- 10 -

actual hardship, aside from the logistical frustrations and delays attendant to being processed for arraignment.

In addition, multiple categories of offenses or offenders are exempted from the mandatory appearance-ticket provision of section 150.20, including offenses committed by any person "charged with a crime for which the court may suspend or revoke his or her driver license," any person with one or more outstanding court warrants and any person who failed to appear for court proceedings within the past two years. See N.Y. Crim. Pro. § 150.20(1)(b). Section 150.20 broadly mandates that officers "shall . . . issue" a DAT for most low-level offenses, but even if an officer fails to comply with state law, plaintiffs' descriptions of being detained for twenty-four to thirty-six hours do not identify an "atypical and significant" condition of detention compared to similarly situated low-level offenders. See Vidal, 171 F.4th at 617.

Because the Complaint does not plausibly allege that section 150.20 created a liberty interest in the issuance of a DAT, plaintiffs' due process claim will be dismissed.

II.     Plaintiffs Do Not Plausibly Allege a Fourth
        Amendment Claim of False Imprisonment.

Plaintiffs assert that they were deprived of the Fourth Amendment right to be free from unreasonable or unwarranted restraint on their personal liberty when they were subjected to prolonged confinement prior to arraignment, rather than being released with DATs. (Compl't ¶¶ 100-04.) They bring a claim of false imprisonment under the Fourth Amendment. (Id.)

This claim is foreclosed by Virginia v. Moore, 553 U.S. 164 (2008), which held that the Fourth Amendment was not implicated when state law enforcement arrested a low-level offender who, under Virginia statute, should have received a summons and not have been taken into custody. In Moore, a criminal defendant argued that the Fourth Amendment required

- 11 -

suppression of narcotics discovered in a search incident to his arrest for driving with a suspended license. Id. at 167-68. He argued that Virginia law required that he receive only a summons and did not permit his arrest, rendering the search unreasonable under the Fourth Amendment. Id. The Supreme Court explained that historically the Fourth Amendment has not been understood to incorporate state statutes and reviewed authorities holding that a warrantless arrest is reasonable under the Fourth Amendment when an officer has probable cause. Id. at 168-73.

Moore "conclude[d] that warrantless arrests for crimes committed in the presence of an arresting officer are reasonable under the Constitution, and that while States are free to regulate such arrests however they desire, state restrictions do not alter the Fourth Amendment's protections." Id. at 176. States may adopt a range of policies about whether certain crimes are not subject to arrest, but "[s]tate arrest restrictions are more accurately characterized as showing that the State values its interests in forgoing arrests more highly than its interests in making them; or as showing that the State places a higher premium on privacy than the Fourth Amendment requires." Id. at 174 (internal citations omitted).[2] If states faced "the potent remedies that federal courts have applied to Fourth Amendment violations," they would be disincentivized from adopting such less-restrictive regimes. Id. Further, "[i]ncorporating state-law arrest limitations" into a Fourth Amendment analysis would result in a "vague and unpredictable" interpretive patchwork that "var[ies] from place to place and from time to time." Id. at 175-76.

---

[2] Bryant, which pre-dates Moore, described the then-operative version of section 150.20 as a proper exercise of such discretion: "New York's discretionary scheme with respect to the issuance of appearance tickets is well within the range of flexibility allowed to the states with respect to their postarrest procedures. What is constitutionally required is that, except in extraordinary circumstances, the arrestee be given a hearing into probable cause for the arrest within 48 hours." 404 F.3d at 138.

- 12 -

Plaintiffs' opposition memo does not address <u>Moore</u>, even though it was discussed by defendants and appears to foreclose the Fourth Amendment claim. Instead, plaintiffs argue that section 150.20 rendered their detention in Central Booking for twelve to eighteen hours an unreasonable seizure subject to "delay for delay's sake." (Opp. Mem. at 11-1.)

In light of <u>Moore</u>, the Court concludes that section 150.20 does not expand plaintiffs' Fourth Amendment rights, and that plaintiffs have not plausibly alleged a claim of false imprisonment under the Fourth Amendment.

Federal courts "often look to state and common law principles to determine the law applicable to § 1983 claims." <u>Davis v. Rodriguez</u>, 364 F.3d 424, 434 n.7 (2d Cir. 2004). "The existence of probable cause to arrest constitutes justification and is a complete defense to an action for false arrest, whether that action is brought under New York law or under § 1983. The same holds true for the false imprisonment claims because, under New York law, the claim is identical to a false arrest claim, and the federal claim looks to the elements of the state claim." <u>Kilburn v. Vill. of Saranac Lake</u>, 413 Fed. App'x 362, 363 (2d Cir. 2011) (summary order) (internal citations and quotation marks omitted). When the face of the complaint demonstrates the existence of probable cause, a false arrest claim is properly dismissed on a Rule 12(b)(6) motion. <u>Michaels v. City of New York</u>, 2011 WL 570125, at *6 (S.D.N.Y. Feb. 16, 2011) (Stein, J.).

The Complaint seems to recognize that there was probable cause to arrest plaintiffs, acknowledging that defendants Claiborne and Holmes "became embroiled in [the] shoving match" with defendant Tavarez that preceded their arrest. (Compl't ¶ 69.) It does not assert that defendants Maroldo and Oliva lacked probable cause to arrest Clarke and Johnson for any of the charges against them, including the tinted-windows violation that prompted the

interaction leading to Clarke and Johnson's arrest. (Compl't ¶¶ 42, 54-55.) Because the Complaint does not assert that defendants lacked probable cause to arrest plaintiffs, the false imprisonment claim will be dismissed.

Plaintiffs' opposition memo also makes clear that their false imprisonment claim is not premised on the absence of probable cause for their arrests but directed instead to their detainment in lieu of receiving a DAT. (Opp. Mem. at 9-13.) The Complaint cites their "extended confinement . . . after they should have been released from police custody with DATs" and asserts that their detention "was not privileged because CPL 150.20 mandated release with a DAT." (Compl't ¶ 102-03.) For the reasons discussed, however, Moore plainly holds that the Fourth Amendment is not implicated by a state's directive that an offender receive a summons rather than be subject to arrest. 553 U.S. at 176.

Lastly, plaintiffs' reliance on Douglas v. City of New York, 79 Misc. 3d 496 (N.Y. Sup. Ct. N.Y. Cnty. 2023), is misplaced, and demonstrates why their claimed injuries are more properly addressed under New York law. In Douglas, plaintiffs sought declaratory relief and money damages after NYPD officers detained them before issuing a DAT. Id. at 498. Plaintiffs asserted that the statutory text precluded any form of detention and required officers to issue the DATs without taking them into custody. Id. at 505-06. The court denied defendants' motion to dismiss and distinguished Moore based on "the liberal protections of the New York State Constitution." Id. at 508-10; see also id. at 509 ("Plaintiffs also counter that defendants' reliance on the Fourth Amendment is misplaced because plaintiffs' claim is based on the New York State Constitution, which affords broader constitutional protections than the Federal Constitution."). In other words, Douglas recognized that section 150.20 and the New York

constitution offered protections that go beyond the Fourth Amendment to the United States Constitution.

Plaintiffs' claim that they were falsely imprisoned in violation of the Fourth Amendment will be dismissed.

### III.   The *Monell* Claim Will Be Dismissed.

The Complaint also brings a claim of municipal liability pursuant to Monell v. Department of Social Services of the City of New York, 436 U.S. 658 (1978).  Because the Complaint does not plausibly allege a violation of plaintiffs' constitutional rights, the Monell claim will be dismissed.  See Askins v. Doe No. 1, 727 F.3d 248, 253 (2d Cir. 2013).

### IV.   The Court Declines to Exercise Supplemental Jurisdiction over Plaintiffs' State Law Claims.

Plaintiffs also bring claims asserting false imprisonment under New York law, the violation of due process under the New York constitution, respondeat superior, and unreasonable search and seizure and use of excessive force under the New York City Administrative Code. (Compl't ¶¶ 112-27.)

Defendants argue that, in the event plaintiffs' federal claims are dismissed, the Court should decline to exercise supplemental jurisdiction over the remaining state law claims. (Def. Mem. at 16.)  In response, plaintiffs argue that the Court should exercise supplemental jurisdiction because their federal claims are adequately pleaded, but they do not argue that the Court ought to exercise supplemental jurisdiction in the event that the federal claims are dismissed.  (Opp. Mem. at 22.)

A district court may decline to exercise supplemental jurisdiction if it "has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). A district court has discretion as to whether it should exercise supplemental jurisdiction over state law

- 15 -

claims when all federal claims have been dismissed.  Catzin v. Thank You & Good Luck Corp., 899 F.3d 77, 85 (2d Cir. 2018).  "It is well settled that where, as here, the federal claims are eliminated in the early stages of litigation, courts should generally decline to exercise pendent jurisdiction over remaining state law claims."  Klein & Co. Futures, Inc. v. Board of Trade of City of New York, 464 F.3d 255, 262 (2d Cir. 2006).  When deciding whether to exercise supplemental jurisdiction over state law claims, "district courts should balance the values of judicial economy, convenience, fairness, and comity – the 'Cohill factors.'"  Id. (citing Carnegie-Mellon University v. Cohill, 484 U.S. 343, 350 (1988)).

Plaintiffs' three claims arising under federal law will be dismissed.  At this stage, judicial economy will not be served by the Court retaining jurisdiction over the remaining state law claims.  Discovery has not yet begun in this case.  Moreover, the interests of fairness and comity weigh heavily in favor of a New York tribunal adjudicating the protections afforded by section 150.20 and the contours of what law-enforcement conduct is permissible under the statute.  See generally Douglas, 79 Misc. 3d at 508-10.

Accordingly, the Court will decline to exercise supplemental jurisdiction over the remaining state law claims.

CONCLUSION.

Defendants' motion to dismiss is GRANTED as to Count One, Count Two and Count Three of the Complaint.  The Court declines to exercise supplemental jurisdiction over the remaining state law claims.  The Clerk is respectfully directed to terminate the motion (ECF 25) and to close the case.

- 17 -

SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
       May 22, 2026